UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE | Bankruptcy Case |
| JAMES KLINE and LIZ KLINE, | No. 12-65099-fra11 |
| Debtors. | MEMORANDUM OPINION |

Debtors filed a motion to assume a lease on Eugene commercial property and to reject leases on commercial properties in Springfield and Cottage Grove, to determine the ownership of certain greenhouses, and to establish the rental rates for the various leases for purposes of assumption and rejection. The parties are attempting to settle their disagreement concerning the greenhouses. This memorandum involves the remaining issues.

## BACKGROUND

On September 11, 2007, Debtors James and Liz Kline, through their newly-formed corporation JNL Ventures, Inc., purchased Gray's Garden Center, Inc., a business with properties in both Eugene and Springfield, Oregon, from its owner Scott Bocci. The purchase was made pursuant to an Asset Sale Agreement (ASA) for a total purchase price of $990,000, with $862,342 cash or credit paid at closing and the remainder payable by a carry-back note (Note) in the amount of $127,658, payable to Mr. Bocci's corporation STWE Enterprises, Inc. The Note, by its terms, was "secured by a security interest in certain collateral identified in the Asset Sale Agreement." A security agreement was prepared and a financing statement was filed by the seller with the Oregon Secretary of State. According to the Debtors'

MEMORANDUM OPINION-1

uncontroverted statement, the seller allowed the financing statement to lapse prior to the bankruptcy petition date. In any case, both the Debtors and Mr. Bocci are treating the Note as unsecured. As part of the sale, the Klines obtained the trade name Gray's Garden Center, Inc. and Gray's Garden Centers. Other assets acquired as part of the ASA were listed in an exhibit attached to the agreement.

Contemporaneously with the ASA, the Debtors entered into lease agreements with HFF Enterprises, LLC, in which Mr. Bocci is the Member Manager, for the real property at both the Springfield and Eugene locations. The Eugene lease is a Lease with First Right of Refusal and contains a cross-default provision referencing the ASA, Note and security agreement, whereby a default in any of those three named agreements would constitute a default under the lease. The Springfield lease is characterized as a Lease Agreement with Option to Purchase and contains the same cross-default provision as the Eugene lease. Neither lease references the other lease. The ASA contains a cross-default provision by which a default on the Note, security agreement, or in either the Springfield or Eugene leases would constitute a default under the ASA. At the time the Debtors filed bankruptcy, the ASA and Note had come due and were in default.

Prior to filing bankruptcy, the Debtors dissolved the Gray's Garden Center, Inc. corporation and transferred the assets of the business to themselves as individuals. The Debtors filed a motion under 11 U.S.C. § 365[1] to reject the Springfield lease and a subsequently executed lease on property in Cottage Grove and to assume the lease on the Eugene property. Mr. Bocci and STEW Enterprises, Inc. filed an objection and seek a further ruling by the court as to the amount required to bring the Eugene lease current and the amount of rent the Debtors will be required to pay in the future on the assumed lease. Those matters were taken under advisement at the conclusion of the hearing on that and other matters on January 30, 2013.

<u>ISSUES</u>

1. Whether the Eugene lease may be assumed without paying the balance due under the Note and ASA in full.

---

[1] All references to the Bankruptcy Code are to 11 U.S.C. §§ 101 to 1532.

MEMORANDUM OPINION-2

2. Whether the current rent payment going forward should be calculated to include past automatic increases due under the terms of the Eugene lease, but which have not been enforced by the lessor.

## DISCUSSION

A. Amount Required to Cure Eugene Lease Default

11 U.S.C. § 365 provides in relevant part:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [or debtor-in-possession] may not assume such contract unless, at the time of assumption of such contract or lease, the trustee --
    (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
    (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
    (C) provides adequate assurance of future performance under such contract or lease.

### Default Under Asset Sale Agreement and Note

Mr. Bocci contends that in order to cure the Eugene lease prior to assumption, as required by Code § 365(b)(1), the Debtors must pay the balance due on the Note, because of the cross-default provisions in the various instruments. Debtors counter that the agreements are discreet instruments for purposes of § 365 and can be assumed or rejected independently.

Under the Bankruptcy Code, an executory contract or unexpired lease must be accepted or rejected in its entirety unless it is severable. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984); *In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 840 (Bankr. C.D.Cal. 1999)(trustee cannot retain the beneficial aspects of an executory contract or unexpired lease while rejecting its burdens); *In re Stanton*, 248 B.R. 823, 830 (9th Cir. BAP 2000)(citing *In re Pacific Express, Inc.*, 780 F.2d 1482, 1486 (9th Cir. 1986))(if the agreement can be disaggregated then each must be considered separately for purposes of section 365).

"Whether multiple obligations in an agreement are severable is a question of state law." *In re Oregon Arena Corp.*, 2006 WL 488713, p.2 (D.Or. 2006)(citing *In re Pollack*, 139 B.R. 838, 940 (9th Cir. BAP 1992). In Oregon, whether a contract is divisible is governed by the intention of the parties, which intention

MEMORANDUM OPINION-3

is deduced from the language used and the surrounding circumstances. *In re Oregon Arena Corp.* at p. 2 (citations omitted). Under Oregon law, "[w]hen parties contemporaneously execute multiple agreements that address interrelated subjects, we are bound to construe them together as one contract to discern the parties' intent." *Snow Mountain Pine, Ltd. v. Tecton Laminates Corp.*, 126 Or.App. 523, 528, 869 P.2d 369 (1994).

The law in California regarding the severability of contracts is similar to that of Oregon - both states require that a court examine the instruments at issue to determine whether a lease is part of a single integrated agreement with other instruments and, if so, whether it is severable from the other instruments. The determination is dependent on the intention of the parties. *In re Plitt Amusement Co. of Washington*, 233 B.R. at 844.

*In re Pollock*, 139 B.R. 838 (9th Cir. BAP 1992) involved the purchase of a campground by the debtor in a transaction that included: a promissory note for the unpaid portion of the purchase price, a sublease of the campground property in which the seller remained as the master lessee, and a security agreement for the note under which the subleasehold and related property were the collateral. The Bankruptcy Appellate Panel affirmed the California bankruptcy court's ruling that the obligations under the sublease were severable from the payments on the note, so that the Debtor could assume the sublease without curing the default on the note. The BAP cited *In re Gardinier*, 831 F.2d 974, 978 (11th Cir. 1987) for three factors the court should consider in making an analysis as to severability: (1) Whether the nature and purpose of the obligations are different; (2) whether the consideration for the obligations is separate and distinct; and (3) whether obligations of the parties are interrelated. *Pollock* at 940-41.

The court found that the Sublease and Note were separate documents that are not expressly incorporated into each other. In the present case, the ASA at ¶ 6.2 discloses the Eugene and Springfield leases as "Companion Agreements" and "as attached hereto and by this reference made a part hereof." The Note, however, is not explicitly made a part of the ASA or of the leases, but states that it "is secured by a security interest in certain collateral identified in the Asset Sale Agreement and is subject to the agreements concerning the security and other provisions of the Asset Sale Agreement as if fully set forth herein." This

MEMORANDUM OPINION-4

language is not sufficient on its own to require a finding that the obligations under the Note were incorporated into the leases.

In the present case, the obligations under the leases are separate and distinct from those of the ASA and the Note. While the leases and the ASA and Note were executed on the same day, the payment obligation in the Note relates to the completed sale of assets and was secured in those assets, while the obligations under the leases relate to the use of real property and have their own separate rights and obligations distinct from the Note. The Note came due on September 1, 2010, while the initial term of the Eugene lease ran to August 31, 2014. It is true that the various agreements contain cross-default provisions, but that is not enough in itself to integrate agreements that are otherwise separate or severable. *In re UAL Corp.*, 346 B.R. 456, 468 (Bankr. N.D.Ill. 2006). It is also true that the leases were incorporated into the ASA (but are not explicitly made a part of the Note) and the sale of assets was made contingent on the Debtors entering into the leases. While this certainly has a bearing on determining the intent of the parties, *Oregon Arena Corp.* at p.3, I do not find it dispositive in this instance given that Debtors were buying a business and the business existed at certain locations.

A similar result was reached in *In re Plitt Amusement Co. of Washington*, 233 B.R. 837 (Bankr. C.D.Cal. 1999) which involved a motion to reject a movie theater lease executed in connection with the debtor's purchase of the theater business. The court ruled that the agreements were not part of a single integrated contract for purposes of § 365. Even if it were part of an integrated contract, the court found that the lease would be severable due to a severability provision in the asset sale agreement which provided that if any provision were rendered invalid, the remaining portions of the contract are not affected thereby. Thus, the court stated, "any portion of the purchase agreement, and any other instrument with which it may be integrated (including the three leases and the secured note) stand alone, and [do] not depend on any other instrument for its survival." *Id.* at 845-46. In the present case, the ASA and Note do not contain a severability provision. However, the Eugene lease contains the following provision at ¶33 (and the Springfield lease at ¶49): "If a court of competent jurisdiction holds any portion of this agreement to be void or unenforceable as written, Lessor and Lessee intend that (1) that portion of this agreement be enforced to

MEMORANDUM OPINION-5

the extent permitted by law, and (2) the balance of this agreement remain in full force and effect." Just as in *Plitt*, this provision shows an intent on the part of Lessor and Lessee that the lease stand alone, separate and apart from each of the other agreements with which it is linked. The court in *Plitt* found that such a severability clause is "pivotal" under the law in Washington (which partly applied in that case), in which the test for determining integration and severability of contracts is based on the intent of the parties, as in California and Oregon. *Plitt*, 233 B.R. at 846.

The court in *Plitt* also cited to *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir. 1986) as being relevant to the issues raised in that case. In *Pacific Express*, the seller argued that the debtor could not avoid the unperfected security interest in equipment[2] unless it assumed the underlying sales contract and cured all defaults and assured future payments in full. The court ruled that the installment sale was not an executory contract, as it was not executory on both sides, and was thus not subject to assumption or rejection. The Ninth Circuit held that requiring the debtor to assume an otherwise avoidable security interest would defeat the purpose behind §§ 365 and 544. *Id.* at 1487. As in *Pacific Express*, Mr. Bocci argues that the Debtors may not assume the Eugene leasehold interest unless they also assume the unsecured obligation under the ASA and the Note. The effect is to use § 365 to create a security interest where none currently exists.[3]

The court in *In re Kopel*, 232 B.R. 57 (Bankr. E.D.N.Y. 1999), ruled that a chapter 11 debtor could not assume his unexpired lease for commercial property without first curing his default under the promissory note he signed to purchase his veterinary practice that had belonged to the lessor's principal. In that case, the principal had sold his veterinary practice to the Debtor on terms whereby $350,000 of the $425,000 purchase price was represented by the promissory note. The court ruled that the commercial lease and the note were part of a single integrated agreement and the intent of the cross-default provision was to allow the seller to reacquire the practice in the event the debtor failed to make payments under the note. In the present case,

---

[2] The unperfected security interest in equipment was represented by an equipment lease which the court ruled was actually for security rather than a true lease.

[3] More specifically, to create a perfected security interest in place of a security interest currently avoidable under § 544.

MEMORANDUM OPINION-6

there is no evidence that Mr. Bocci structured the sale of his business in the way he did so that he could reacquire and operate the business in the event the Debtors defaulted on the promissory note. He received 87% of the purchase price at closing and secured the balance with a security interest in the collateral identified in the ASA. It seems clear that the purpose of the agreement was to secure payment of the balance, and not to secure the seller's re-entry into the business.

As the *Plitt* court stated, bankruptcy law is not subject to "artful drafting." One of its primary purposes is to relieve debtors of their improvident agreements while, at the same time, permitting a trustee or debtor in possession to take advantage of those agreements that are beneficial, for the benefit of creditors. *Plitt* at 847. I find that the leases at issue are severable from the Asset Sale Agreement and the Note and that the Eugene lease may be assumed without first satisfying the default under the ASA and Note.

<u>No Default Under Eugene Lease</u>

Evidence was presented at the hearing in this matter that Debtors are current on their lease obligations. Because the court has determined that the Eugene and Springfield leases are severable from the obligations under the ASA and the Note, the court will allow assumption of the Eugene lease.

B. Amount of Rent Going Forward

Paragraph 1.1 of the Eugene lease provides for an annual rent adjustment beginning on January 1, 2009 "to reflect changes in the cost of living as provided herein." ¶ 1.1.1. A detailed formula for calculating the annual rent adjustment is provided at ¶ 1.1.1, subject to ¶ 1.1.2, which provides that in no case shall the monthly rental amount be reduced below the "initial monthly rental amount or the last adjusted monthly rental amount . . . , nor shall the monthly rental amount increase by more than four (4%) percent in any given year." The Springfield lease contains terms identical to those of the Eugene lease.

When the first annual rent adjustment was due under the leases, Mr. Bocci orally told the Debtors that he would not enforce the rent adjustment provision that year. Mr. Kline testified that in subsequent years, while nothing was expressly said concerning the rent adjustment, Mr. Bocci did not raise the monthly rent. The question going forward is whether the annual rent adjustment under the lease agreement, as of January 1, 2013, should be calculated against a rental amount which includes the past annual adjustments which were

MEMORANDUM OPINION-7

not enforced by the landlord. Mr. Bocci has indicated that this is the way he intends to calculate the current rent. This would increase the monthly rent on the Eugene lease to $9,349.23 and on the Springfield lease to $7,685.23 from, respectively, $8,315 and $6,835.59. Neither party apparently disputes the amount of rent on the Cottage Grove property.

Debtors argue that the current rent escalator should be applied against the <u>actual</u> amount of rent paid during the last annual rental period, producing a monthly Eugene lease payment for 2013 of $8,481.30. Alternatively, if the court should allow past annual increases to be used, Debtors argue that the increase in the payment should be limited to 4% due to lease ¶ 1.1.2, which limits the rent increase to no more than 4% in any given year. That would increase the Eugene 2013 lease payment to $8,647.60.

I find that the position taken by Mr. Bocci is justified in the circumstances of this case. The Eugene lease provides at ¶ 30 that "[a]ny modifications, changes, additions, or deletions to this agreement must be approved by Lessor and Lessee, in writing." It provides at ¶ 24 that the "[f]ailure by Lessor or Lessee to enforce any right under this agreement shall not be deemed to be a waiver of that right or any other right." The Springfield lease contains identical terms. Mr. Bocci chose not to enforce the annual rent adjustment in the years prior to 2013. By the terms of the lease itself, that did not constitute a permanent waiver or modification of his right to compute the current lease payment pursuant to the terms of the lease. The 4% limitation to the rent adjustment applies to the calculation made each year in calculating the base amount to which the current rent adjustment is applied.

## CONCLUSION

For the foregoing reasons, an order will be entered by the court granting the Debtors' motion to assume the Eugene lease and reject the Springfield and Cottage Grove leases. The order will also reflect that the monthly rent amount on the various leases is as calculated by Mr. Bocci.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-8